271 So.2d 833

Joseph A. BATEH

v.

Richard Hail BROWN et al.

S. C. 8.

Supreme Court of Alabama.

Nov. 16, 1972.

Rehearing Denied Feb. 1, 1973.

William M. Acker, Jr., and Ferris S. Ritchey, Jr., Birmingham, for appellant.

Sadler, Sadler, Sullivan & Sharp, Birmingham, for appellee.

MERRILL, Justice.

This appeal is from a decree in a case involving the dissolution of B–D Development Company (hereinafter referred to as B–D), a partnership composed of Richard Hail Brown and Joseph A. Bateh.

On March 7, 1968, Brown filed a bill in equity against Bateh seeking to dissolve the B–D partnership. The bill alleged that B–D was an equal partnership between the parties, which owned several separate parcels of real property, subject to certain mortgages and leases. It then averred that the two partners could not agree on policies and plans for the conduct and management of the business and that the best interest of the partners and of the business would be served by a dissolution. The prayer was that the partnership be dissolved and that the lands be sold, either at public or private sale, that all proper charges against the partnership first be paid, including title insurance, and that the balance be distributed to the partners.

Bateh's demurrer was overruled and he filed his answer, admitting certain of the averments of the bill and denying others. In his answer, Bateh specifically agreed that the real property should be ordered sold by the trial court, at dissolution, and that the debts, including mortgage indebtedness, should first be paid before any distribution. Bateh attached as an exhibit to his answer a copy of the written partnership agreement executed by and between the parties. It provided, inter alia, that either partner desiring to dissolve the partnership must notify the other and first offer to sell his interest to the other if the other should so elect, and that the "partnership debts shall be discharged" before any dissolution. Bateh alleged that the partnership should be dissolved under the terms of the partnership agreement.

On September 19, 1969, the first of many oral hearings was held. After the hearings, on April 14, 1970, Bateh filed a verified petition for an injunction against Brown and Charles C. Morton (hereinafter referred to as Morton), who was an employee of B–D, seeking to stop them from paying Brown's personal obligations from B–D funds; to stop them from hypothecating stocks which B–D owned in Southeastern Enameling Corporation (hereinafter referred to as SECO) and National Filtronics, Inc. (hereinafter referred to as National); to stop them from paying Brown a salary; and to stop them from paying Morton any more than a salary of $500.00 per month. Brown and Morton filed their answer to this petition on April 23, 1970, and after a hearing, the trial court dismissed Bateh's petition for injunction.

On May 4, 1970, after much evidence had been introduced by both parties, the parties submitted the cause on a note of testimony signed by both, including the testimony of Brown, Bateh and Morton, as well as certain written exhibits, and the trial court took the case under submission for final decree. On May 14, 1970, the trial court entered a decree formally dissolving B–D. The trial court specifically declined to rule on a claim which was pending against the partnership by Bateh's two sons, holding that they were not parties to the cause and, therefore, could not be bound; it appointed Morton as "manager of the business" without naming him as receiver, or requiring a bond; it referred the partnership affairs to the register for an accounting; it divided the corporation stocks, such as SECO and National, owned by B–D, equally between Brown and Bateh and ordered that the said division be reflected on the transfer books of the said corporation; and it reserved the question of a sale of the partnership real property "because of the possibility that the parties may consider it to their best interest to reach an agreement * * * relative to a division in kind." There was no finding

that the property could be partitioned or equitably divided "in kind" except and unless by agreement of the parties. The trial court, in instructing the register, specifically held that Bateh was not to receive any interest on his loans to B–D unless he could prove that he had himself borrowed the money at interest; that Brown did not have to pay interest on his over-draw, and that B–D did not have to pay interest to Bateh on his under-draw.

On October 16, 1970, Bateh filed another verified petition for injunction against Brown and Morton setting forth that the trial court, on May 14, 1970, had orally ordered Brown not to take further legal fees from B–D or from National or from SECO and not to take any further salary from B–D, and seeking to enjoin such continued withdrawals by Brown. On October 20, 1970, Brown and Morton answered, both appearing by and through a mutual solicitor, not now connected with the case. On October 20, 1970, the trial court heard Bateh's motion and again orally enjoined and admonished Brown from taking any such additional emoluments as Bateh had complained of, so as to prevent Brown from receiving any more from the parties' allied enterprises than Bateh received. The record shows:

"THE COURT: Since the hearing in May, how much money has Mr. Bateh drawn from different organizations?

"MR. ACKER: Zero.

"THE COURT: The general consensus—rather the general attitude of my order was to freeze the payment of any funds. There has been no application here that Mr. Brown be allowed to draw monies out of any organization. * * *"

The trial court entered no written order on the motion and taxed no costs.

Pursuant to the decree of May 14, 1970, the register set the matter for a hearing. The hearing before the register on the accounting features was quite lengthy. After the hearing, the register filed his report

on January 8, 1971. On February 15, 1971, Brown filed exceptions to the register's report, and on the same day, Bateh filed his exceptions to the report. After an oral hearing on the exceptions, the trial court on May 10, 1971 overruled all of the exceptions of both parties, except in certain minor respects not here pertinent.

On February 24, 1971, Bateh had filed a verified petition for a contempt citation against Brown, charging that Brown had taken $1,000.00 compensation from National contrary to the oral order of the trial court of October 20, 1970, and the trial court issued a rule nisi on the petition. On May 10, 1971, the trial court overruled and denied this petition without any finding of fact or comment on its merit.

On March 8, 1971, Morton, as "court-appointed manager," filed a petition seeking to sell certain partnership assets and to get certain instructions. On April 26, 1971, Morton amended his petition. Brown did not respond to the petition; however, Bateh, on March 17, 1971, answered it. Except as the issues presented by Morton's petition may have been ruled on expressly or impliedly, in the final decree of August 31, 1971, the said petition was never acted upon by the trial court.

On March 11, 1971, Bateh filed a verified petition to have Morton removed as "manager," charging Morton with various acts of mismanagement and partiality toward Brown, and, in the alternative, prayed for a surety bond to be required of Morton. On May 10, 1971, the trial court overruled and denied this petition.

On April 19, 1971, Morton filed a petition and report purporting to state an account between the partners. Morton, for the first time here, appeared by counsel other than Brown's counsel. On May 5, 1971, Brown answered Morton's petition and on May 6, 1971, Bateh answered it, pointing out affirmatively to the trial court that a compromise settlement had been reached between the parties which Brown had then refused to formally execute.

On May 18, 1971, Bateh filed an exception to the trial court's decree of May 10, 1971, particularly pointing out to the trial court that there was no testimony or other evidence upon which to base a partition or division "in kind," as hinted at in the decree of May 10, 1971, to be a possibility, especially unless and until all partnership creditors were paid.

On May 18, 1971, Brown amended his original bill of complaint, which had been filed three years before on March 7, 1968, seeking for the first time to change the prayer from a sale for division of the partnership real property to a partition or division "in kind." However, the prayer, as thus amended, still recognized that only the lands "in excess of those needed to pay the debts of B–D" should be partitioned. No new note of testimony was filed.

On May 18, 1971, Bateh demurred to the bill as thus amended, incorporating all previous grounds of demurrer and adding grounds pointing that the amendment came too late, was not contained in the note of testimony, and found no support in any competent evidence.

On May 18, 1971, Bateh filed a verified motion pointing out that neither the Morton report nor the register's report reflected a partnership obligation which Bateh had just discovered was owed to the First National Bank of Birmingham in the principal amount of $87,951.00.

On June 1, 1971, the First National Bank filed its verified claim against B–D showing a promissory note from B–D to it in the principal amount of $87,951.00.

On June 14, 1971, Dun & Bradstreet, Inc. filed its verified claim of $1,500.00 due on a contract executed by B–D, and on which suit had already been filed.

On July 7, 1971, Morton filed another petition and report, reciting that he had tried his best to settle the case by having his attorney draw a proposed consent decree, but that they had been unsuccessful. He attached a copy of the decree which he

had proposed, but which the parties had refused to adopt.

On July 7, 1971, the trial court entered an order setting the case for final argument and submission on August 9, 1971.

On August 6, 1971, Brown filed objections to Morton's petition and report and objections to his proposed decree. On August 9, 1971, Bateh filed objections to Morton's petition and report, particularly reciting that his earlier willingness to settle had been based on his understanding that every item in the proposal would be included, and not just those items which suited Brown and Morton, and that he was no longer interested in a settlement.

On August 24, 1971, Louise S. Cole, an employee of the partnership, who had been terminated by Brown during the dissolution proceedings, filed her verified claim against B–D in the amount of $19,344.60. It was not liquidated, as had been the claims of First National and Dun & Bradstreet.

On August 31, 1971, the trial court finally entered a final decree. The decree simultaneously covered both B–D and the dissolution of a corporation known as BBC Investment Company, which was involved in a separate case (S.C. 7). 289 Ala. 695, 271 So. 830.

The decree, insofar as it dealt with B–D, effected a division "in kind" of the assets of B–D. We do not set out all of the items of the decree, because it is reversed in toto, and we mention later some of the items which we consider to be erroneous. The first part of the decree reads as follows:

"For more than three years, the disputes between Richard Hail Brown and Joseph A. Bateh have been aired and argued before this Court. During this period, the Court has considered many pleadings and has held many hearings. The necessary accounting between the parties relating to their several partnership and corporate ventures has been submitted to the Register and he has made his report and the court has affirmed said Report. A Manager, Charles Cary Morton, has been appointed by the Court to manage the affairs of the parties. This manager, having been employed by the parties over a long period of time in a managerial capacity, is knowledgeable and competent to carry out his duties and the Court has relied upon his skill and his advice in making the decisions necessary to the determination of the issues in these two causes. The Court has also received assistance from the Register and from the attorney, Hon. Wade Morton, employed by the said manager with the Court's approval.

"On August 9th, 1971, (pursuant to the Court's ORDER of July 7, 1971,) both these causes were set for a final oral hearing at which a Petition and Report and a suggested Final Decree prepared by the Court's manager at the Court's request and any and all other and further matters which had not already been considered by the Court were to be heard and considered by the Court looking toward a final disposition and adjudication of all the disputes between the parties as posed by the pleadings.

"Accordingly, it is CONSIDERED, ORDERED, ADJUDGED and DECREED as follows:

"ONE: That the Financial Statement filed herein on, to wit; April 19, 1971 by the Court's said Manager is hereby adopted and affirmed.

"Further, that said Manager shall, forthwith, extend and close the books and accounts of the partnership and of B.B.C. Investment Company, Inc. as of the date of this instant Final Decree and is hereby authorized to employ Herbert Raburn, a Certified Public Accountant, to verify the said activities of the said Manager and the charge for the services of the said Raburn shall be taxed as a part of the costs of these actions.

"TWO: The corporate entity, B.B.C. Investment Company, Inc. is hereby declared to be dissolved."

It will be noted that the trial court depended heavily on Charles C. Morton and that Morton prepared the suggested final decree at the court's request. Morton began working for B–D in 1961. He was interviewed and hired by Brown. He evidently knew his business and B–D profited from his work. In October, 1969, his salary was: B–D $6,000.00 per year, from National $9,000.00 per year and from SECO $10,000.00 per year, making a total of $25,000.00. B–D had effective control of National and SECO. Whenever there was a disagreement between Bateh and Brown, he could not follow the instructions of both, and he testified, "—so I followed Mr. Brown's." Brown had two heart attacks, but Morton continued to consult him and Brown "didn't get into the day-to-day operations, but the overall policy, he dictated that to me." Morton was president of SECO and Brown was chairman of the board. Morton was executive vice-president of National and Brown the chairman of that board. Brown testified that he interpreted the partnership agreement between Bateh and Brown as giving Brown total and complete charge of every policy-making decision of the partnership even after Brown brought his suit to dissolve it.

Another example of the way Bateh was treated is the handling of the stock in SECO. This corporation evidently was making money. Most of the stock was owned by B–D. Morton testified that he divided the stock one-half to Bateh and one-half to Brown. Then, later, he reissued all of it and put it all in Brown's name. Later on, Brown told him "Let's rescind this thing and put it back as it was." He restored it to the previous category. Some stock in SECO was put in Morton's name and although it was owned by B–D, Morton voted his stock with Brown to the extent that Betah had no voice in the operation of SECO.

Morton was Brown's man. He did what Brown wanted done with the partnership. He listened to Bateh but he followed Brown's instructions. The trial court relied on Morton's "advice in making the decisions necessary to the determination of the issues in these two causes," and the suggested final decree was prepared by Morton. There is no question of Morton's superior management ability but he was hired by Brown, directed by Brown and could be fired by Brown. It is understandable that Morton's advice to the court would be influenced by his position and loyalty and that any suggested division "in kind" of the partnership (and corporate) assets, although owned equally by Bateh and Brown, would be tipped in favor of Brown, his employer and benefactor.

Appellant argues under assignment of error 4 that there is no evidence as to the value of many of the properties which are assets of the partnership. Certainly, there is no valuation of them in the final decree. This court cannot look at the decree and balance, for example, one motel against another, because we are not privy to their worth.

Appellee Brown points to his Exhibit "B" which was Brown's personal inventory of the partnership assets as of November 1, 1968. This inventory was prepared by Brown, was not appraised, the figures were unaudited and was a "statement that was in existence prior to the time that Mr. Bateh became a partner in B. D." The record shows that the then counsel for appellee Brown at a hearing on September 19, 1969, stated:

"MR. THOMAS: If the court please, I would like to introduce this in evidence. Not for the purpose of placing an accurate value, but shows the descriptions of the properties that have been developed and acquired by the partnership."

After some colloquy and a short voir dire, the court stated that the exhibit would be admitted, "Number 1, to delineate the property ownership of B. D. Development

Company, and Number 2: His personal opinion as to their value."

The inventory listed twenty different items. The admittedly inaccurate value was placed at over four million dollars.

These figures were nearly four years old when the final decree was entered on August 31, 1971, and certainly are not adequate for us to determine whether or not the division "in kind" was fair. Moreover, this evidence was offered in support of Brown's bill to dissolve the partnership, not to effect partition "in kind."

We agree with appellant that the record does not contain sufficient evidence as to the worth of all the partnership assets to fairly effect partition "in kind."

■ Assignment 7 charges that the court erred in making a division of the partnership properties "in kind" without first providing for the payment of partnership creditors.

Title 43, § 31, Code 1940 (repealed in 1971, but applicable in this case) provides:

"Each member of a partnership may require its property to be applied to the discharge of its debts, and has a lien upon the shares of the other partners for this purpose, and for the payment of the general balance if any due to him."

Brown invoked this statute when he filed his bill · to dissolve the partnership in March, 1968. In paragraph 6 of his bill, he stated that it was to the best interest of the parties that the partnership be dissolved and its affairs liquidated; "and that after paying or providing for payment of the debts of the partnership that the assets remaining be distributed in appropriate accounting." The prayer of the bill contained the following: " * * * and that after payment or provision for the payment of the debts of the partnership that the assets thereof remaining be distributed to complainant and respondent as shall be directed by the Court in appropriate accounting: * * *."

This was the law in Alabama before the adoption of the statute. In Goldsmith v. Eichold Bros. & Weiss, 94 Ala. 116, 10 So. 80, this court, per Stone, C. J., said:

"The first duty devolved by this trust on each of the partners is to apply the partnership effects to the payment of the debts of the partnership, and not to pervert them to individual uses or wants, without the consent of the co-partners. Any attempt to so pervert them, whether by private arrangement or under judicial proceedings, can be intercepted by the nonconsenting partners. This, on the plain principle that, being beneficiaries under the trust, they have a clear right to prevent its breach.

\* \* \* \* \* \*

" * * * Each partner has the right to have the partnership debts paid with partnership effects, so as to relieve his individual property of the burden; and each partner has a clear right to his share of any surplus that may be left after paying the partnership debts. All men will assent to the soundness and justice of the principles stated above.

\* \* \* \* \* \*

" * * * It is their debtor's right to have the assets thus applied; and in enforcing that clear right the benefit and preference accrue to the partnership creditor. * * *" Item Six of the decree begins as follows:

"That the following debts of B–D Development Company and of B.B.C. Investment Company, Inc. shall be assumed to the extent of one-half (½) thereof by Richard Hail Brown and one-half (½) by Joseph A. Bateh."

The decree then lists (a) an unsecured note payable to Azizah Bateh for $120,000.00; (b) a note payable to First National Bank of Birmingham for $87,951.00; (c) a note payable to First Federal Savings and Loan Association, at Bessemer, the balance being $265,799.25; (d) a debt owed Zaidah Bateh in the

amount of $26,150.00; (e) a note to Joseph A. Bateh (one of the partners) in the sum of $42,500.00. Paragraph Sixteen provides that the $1,500.00 owed to Dun & Bradstreet shall be assumed one-half by Bateh and one-half by Brown.

Paragraph Eleven of the decree, as amended, provides:

"That Richard Hail Brown and Joseph A. Bateh shall, forthwith, execute and deliver all such conveyances, deeds, transfer instruments, notes, mortgages and other writings necessary or proper to effectuate and complete the acts authorized and/or directed to be done by the terms and provisions of this instant Decree; and each of the said parties shall pay and save harmless the other from all of the debts and obligations herein in this Decree directed to be assumed by them; and the terms and provisions of this instant Decree shall be binding upon the heirs, administrators, executors and assigns of the partners."

Appellees state in brief that the decree "clearly provides for the disposition of debts, in paragraphs Six, Fourteen and Sixteen." We merely note that "disposition" is different from "payment."

Paragraph Six and Sixteen, as already noted, merely provide that each partner shall assume one-half of the listed debts. But what if one partner fails to pay? The other partner is, under our law, saddled with the debt. And what creditor is going to be willing to have his debt split between two partners when the law makes the assets of the entire partnership liable for its debts and, generally, each individual partner is liable to creditors of the firm for the whole amount of every debt due therefrom. Cleckler v. First Nat. Bank of Anniston, 204 Ala. 268, 85 So. 484.

Paragraph Fourteen provides:

"That certain debt due by the partnership to Joseph A. Bateh, Jr. and J. Fred Bateh in the sum of $30,000.00 shall be assumed by Joseph A. Bateh; said debt being the subject matter of the suit entitled Joseph A. Bateh, Jr., Plaintiff versus Richard Hail Brown, et al, Defendants, and the case entitled J. Fred Bateh, Plaintiff vs. Richard Hail Brown, et al, Defendants, being case No. 28512 and 28510, respectively, now pending in the Circuit Court of Jefferson County, Alabama; that Joseph A. Bateh shall pay and save harmless Richard Hail Brown from any judgment recovered by Plaintiffs, or either of them, in said suits."

This is a rather loose handling of claims and law suits of people not even parties to this suit. It would be new law to hold that such an item could legally bind Joseph A. Bateh, Jr. and J. Fred Bateh, strangers to this suit.

Assignment 8 charges error in that the decree purports to bind third-party creditors to a division of the joint liability of the partners.

█ We cannot understand how creditors of a corporation or a partnership can be denied their right to subject the assets to their debts, after dissolution, in preference to the claims of the stockholders or the partners. See King v. Coosa Valley Mineral Products Co., 283 Ala. 197, 215 So.2d 275.

In dividing the assets and debts of the partnership, the trial court invested full title in the following to Bateh:

"(e) All of those certain promissory notes executed by National Filtronics, Inc., to B–D Development Company, Inc., the balance due thereby being in the sum of $111,229.34, together with interest to the date of this decree, which said sums shall be credited to the capital account of Joseph A. Bateh in the partnership accounts.

\* \* \* \* \* \*

"(g) Pursuant to Paragraph 'Sixth' of the Decree of this Court entered herein on May 14, 1970, one-half (½) of the capital stock of National Filtronics, Inc.,

owned by B–D Development Company or registered in the name of Richard Hail Brown for B–D Development Company, has been re-issued to Joseph A. Bateh."

This put all the stock of National in the hands of Bateh together with the $111,229.-34 note which National owed B–D. On its face that apparently looks all right. But on application for rehearing, Bateh listed four grounds relating to this order. We copy grounds 13 and 15:

"13. For that the decree is erroneous and grossly unfair and inequitable in assigning the promissory note of National Filtronics to petitioner and charging it at face value to petitioner's capital or partnership account, when in truth and in fact National Filtronics, Inc. was insolvent at the date of the decree and is now insolvent, and the said promissory note is of very doubtful value, if not worthless. An affidavit in support of this ground is attached hereto as Exhibit A and is incorporated herein as if set forth in full.

\*   \*   \*   \*   \*   \*

"15. For that the decree is erroneous and grossly unfair and inequitable in assigning the common stock of National Filtronics to petitioner and charging it at face value to petitioner's capital or partnership account, when in truth and in fact National Filtronics, Inc. was insolvent at the date of the decree and is now insolvent, and the said common stock is of very doubtful value, if not worthless. An affidavit in support of this ground is attached hereto as Exhibit A and is incorporated herein as if set forth in full."

Bateh's accompanying affidavit stated that a financial statement showed that it was insolvent on August 31, 1971. The income and expense of National for the year ended January 31, 1971 (also attached to the motion for rehearing) showed a net loss of $586,982.13; and for the six months' period ended August 31, 1971, a net loss of $62,731.53.

The trial court did not change the decree. It appears to us that Bateh did not get much in the way of assets when he got all the stock of National.

■■■■ Appellees filed a motion to dismiss the appeal and argue in brief that Bateh is holding on to the fruits of the decree, and since he has not made restitution, his appeal should be dismissed. It is the general rule in Alabama that an appellant who has received proceeds under a judgment or decree which is challenged by appeal must make restitution of the proceeds as a condition precedent to the continuation of his appeal or suffer dismissal. Alco Land and Timber Co. v. Baer, 289 Ala. 567, 269 So.2d 99, and cases there cited. But as noted in that case, the "rule is not without exception."

In Nixon v. Bolling, 145 Ala. 277, 40 So. 210, this court said:

"The bill in this case is filed to abate a nuisance. The appeal is taken from a final decree of the chancery court—granting the complainant the relief prayed for. Motion is made by the appellee to dismiss the appeal, for that, since the taking of the same, the appellants, respondents in the court below, have satisfied the decree by a performance of its mandatory order. In taking the appeal the respondents had the right to supersede the execution of the decree by the giving of the supersedeas bond prescribed by the chancellor, but the failure to give such bond did not take away their right of appeal. The failure to give such supersedeas bond left the respondents with the alternative of performing the decree or of being held in contempt for nonperformance. Under these circumstances the performance by the respondents of the decree cannot be regarded as a voluntary performance in the sense which would render a voluntary satisfaction of a judgment a waiver of the appeal. See authorities cited in note to the case of State v. Conkling, [54] Kan. [108], 37 P. 992, 45 Am.St.

Rep. 270; 2 Cyc. pp. 647, 648. The motion to dismiss the appeal must be overruled. * * *"

See also First Nat. Bank of Birmingham v. Garrison, 235 Ala. 94, 177 So. 631.

After the decree was rendered, Bateh asked that the amount of a supersedeas bond be set and the trial court set it at $100,000.00.[1] Bateh did not make it. It is understandable that he would not care to make that large a bond when Brown and Morton were operating both the corporation and the partnership as they saw fit and even though Bateh owned one-half of each, he was "on the outside looking in" and had no voice in the operation of both businesses.

On November 5, 1971, Brown filed a petition to require Bateh and his attorneys to show cause why they had not complied with the mandatory orders in the decree, in view of the fact that Bateh had appealed but had not filed a supersedeas bond. After a hearing, the court ordered Bateh to perform or post a supersedeas bond. Bateh then filed a tender of compliance which reads as follows:

"Comes now Joseph A. Bateh, respondent-appellant in the above styled cause, and respectfully shows unto the Court as follows:

"1. The Court has fixed a supersedeas bond in the amount of $100,000.00. Respondent-appellant respectfully avers that the said bond is so unreasonably high that, although he has made a diligent effort to post it, he has been unable to do so. Therefore respondent-appellant respectfully declines to post supersedeas and tenders compliance, as will hereinafter appear.

"2. Without waiving his interpretation of the final decree as far as the liabilities of Richard Hail Brown and B–D Development Corporation are concerned, but expressly insisting on same, and

without waiving his appeal to the Supreme Court from the said final decree, respondent-appellant hereby tenders full compliance insofar as he is physically able to do so, and offers to execute all instruments necessary to effectuate the final decree. Respondent-appellant respectfully avers that some of the persons or entities named in the final decree as obligated to do certain things, have not indicated a willingness to conform, and respondent-appellant is not in a position to control any or all of said persons or entities. Their compliance or non-compliance is not the responsibility of respondent-appellant and cannot form the basis for non-compliance by any of the actual parties to the cause.

"WHEREFORE PREMISES CONSIDERED, respondent-appellant prays that this be taken as and for his tender of compliance with the final decree of, to-wit, August 31, 1971, and he stands ready, willing and able to comply."

Bateh was faced with compliance of mandatory orders in the decree or of being held in contempt for non-performance. Under these circumstances, the performance by Bateh cannot be regarded as a voluntary performance in the sense which would render a voluntary satisfaction of a judgment or waiver of the appeal.

Appellees place much stress on the fact that Bateh had received a large sum of money under Paragraph Nine of the decree, which provides in part:

"That Joseph A. Bateh shall have and recover of Richard Hail Brown the sum of $94,331.83 to be credited to the capital account of Joseph A. Bateh, in the partnership accounts, which said sum is necessary to balance the capital account of the partnership in the partnership account, * * *."

[1]. The same amount was set as the bond in S.C. 7. That meant bonds of $200,000.00.

We do not know from the record how this figure was computed or what is included. Appellees state in brief that the excess of Bateh's adjusted account over Brown's account was $188,663.66 and Bateh would be entitled to one-half that amount which is $94,331.83. Part of whatever difference that was built up, according to Morton's testimony, by Brown's withdrawals from the business, including between $10,000.00 and $11,000.00 for a world tour, memberships in the Downtown Club, Mountain Brook Country Club, The Club, Birmingham Bar Association and Gulf Shores Golf Club, and $500.00 per month legal fees from two companies.

This $94,331.83 was just part of the decree. We are told that deeds to various properties were exchanged and that there was some compliance with the decree. We do not know what the ultimate conclusion will be, but we are convinced that the motion to dismiss should be overruled. We note here that counsel for appellees did not enter the case until after the final decree was rendered.

Appellees' main thrust in argument is that the final decree was similar to a proposed decree which had been agreed to by Bateh but had been rejected by Brown. This proposed decree was attached as an exhibit to Bateh's answer to the petition and report of Morton which had been filed on April 19, 1971. The answer stated that "The only reason respondent (Bateh) agreed to said compromise settlement was in order to settle *all* differences between the parties."

■ We do not know why the proposed decree of settlement was attached to the answer unless it was to show the court that Bateh had been, at one time, willing to settle all the differences between him and Brown. But counsel for both sides and the court know that an offer to compromise is inadmissible in evidence, 9 Ala.Dig., Evidence, ☞213(1); and to encourage extra-judicial settlements, the law protects offers of compromise. Indemnity Company of America v. Pugh, 222 Ala. 251, 132 So. 165. No ruling of the trial court was sought on the exhibit. We do not consider it as admissible evidence.

■ On the matter of whether Bateh should be paid interest on the sums he loaned the partnership, we do not express an opinion as to all of his loans or advances, but there was evidence that for some years the interest was listed on the books as paid to Bateh and although he did not get it, Bateh paid income tax on it because the books showed it was paid to him. We cannot understand why this interest should not be paid to him.

■ Assignment 11 charges that the court erred in "attempting to force a compromise settlement upon the parties without their agreement."

As already shown, the original bill by Brown prayed for a dissolution of the partnership, Bateh had agreed and after the case was submitted, Brown amended seeking a division "in kind," but in the amended prayer, he asked that the lands and assets of B–D, "in excess of those needed to pay the debts of said B–D Development Company, be partitioned, or divided, in kind, between complainant and respondent."

We are convinced that the trial court felt that the parties would profit by a division "in kind." The case had begun in 1968 and had occupied and taxed much of the court's time and patience. The record consists of 8 volumes and over 1587 pages. When it looked as if they might agree, the Morton report was filed and both sides filed exceptions. At the last hearing before the final decree was entered, the trial court began it by some rather plain and straight talk. (This talk actually occurred on May 7, eleven days before Brown filed his amended bill and prayer on May 18, 1971.)

Among the things the court said were:

"* * * I am pleading with you, now, to make a last attempt; and I hope it

will be successful, to resolve this case once and for all today, because, Gentlemen, let me tell you this: If you don't do it, you are going to be sorry, both of you are going to be sorry about it. You are sorry now that you didn't do something about it earlier and just like I told you, you could have done it and should have done it then, but don't let this thing go any further. It's not right and I don't blame you for being hard-headed. I am hard-headed myself. A man has got a right to be hard-headed where his future is involved, but there is more to it than that and you two gentlemen ain't going to live forever, any more than I am, and we are in our twilight years, and it's time now you thought about something besides litigation, and litigation is really just the beginning. You are just staring litigation in the face now, because it's coming in the future; and it's going to be costly and it's going to be expensive and it's going to be hard on both of you's hearts, and I know you both have heart affections. * * *"

A little later, the following took place:

"THE COURT: Well, it looks like the parties can't agree on a division in kind.

"MR. THOMAS: I think the trouble or the reason they can't agree on a division in kind is because, as shown by Mr. Acker's latest report, they are trying to settle all of the other controversies.

"THE COURT: I am going to tell you one thing, Mr. Thomas, they had better agree on a division in kind.

"MR. THOMAS: Yes, sir.

"THE COURT: It's going to be to everybody's advantage for them to do it, and that is why I have been trying to get y'all to do it all of this time. If you don't do it, somebody is going to be sorry about it, and very sorry."

It seems that this talk convinced Brown because he amended and asked for division "in kind," and his man Morton advised the court how to divide it.

Up until the court made the talk suggesting division "in kind," the parties were proceeding under the statutes to dissolve the partnership and, in S.C. 7, to dissolve the corporation. Each partner and owner was ready, but is evident that the trial court decided that there would be a division "in kind."

We know that all courts urge and recommend settlements, but here, the parties had litigated over three years seeking dissolution under the statutes, and suddenly, the court practically imposes a method on them which they had not sought and one which, as already demonstrated, could not work or be allowed to stand.

The trial court was correct in the prediction that litigation would increase in the future. When creditors of the partnership learned of the decree and saw the assets on which they had extended credit cut in half by the final decree, it could only mean additional legal activity on their part.

Both sides have alluded in briefs to events that have happened since this case was appealed. Appellant has a rather thick appendix to his brief. In the argument section of his brief, he states: "There is no need to speculate about the disasterous results which flow from the final decree of August 31, 1971. Attached to this brief is an Appendix showing some of the direct effects. Appellant invites the Court's careful attention to this Appendix." The author of this opinion did not accept the invitation. The appendix has neither been read nor perused. We have tried to limit what we have considered and written to the record before us, and not what is contained in briefs as to matters de hors the record.

As we said in S.C. 7, Bateh v. Brown, 289 Ala. 695, 271 So.2d 830, this day decided, we are not opposed to a division "in kind" if both sides agree in writing, the division is approved by the court, and the creditors of the partnership are fully pro-

**712**

tected. We know that certain deeds have been exchanged and some other exchanges of assets have been made. Those to which both sides agree may stand provided the creditors are protected or paid. Therefore, it is directed that a new trial not be set for earlier than sixty days from the announcement of our decision in this case in order that the parties may have time to agree on the division of some or all of the property if they can. After the time for agreement has passed, it would seem that the prayer for the dissolving of the corporation, the payment of debts and the equal division of the remainder of the assets, after being balanced, should be granted and the partnership dissolved according to statute.

In the event it is seen proper to consolidate the cases for the taking of testimony, separate decrees should be entered in the two cases.

Motion to dismiss the appeal denied.

Reversed and remanded.

HEFLIN, C. J., and HARWOOD, MADDOX and SOMERVILLE, JJ., concur.

