310 So.2d 186

**Fred BATEH**

v.

**Richard Hail BROWN et al.**

**Joseph A. BATEH, Jr.**

v.

**Richard Hail BROWN et al.**

**SC 641, SC 641–A.**

Supreme Court of Alabama.

Feb. 20, 1975.

Rehearing Denied April 3, 1975, in No. SC 641–A.

706

McMillan & Spratling, Birmingham, for appellees.

William M. Acker, Jr., Ferris S. Ritchey, Jr., Birmingham, for appellants.

JONES, Justice.

This is a joint appeal from the Circuit Court of Jefferson County wherein two judgments based on jury verdicts in two separate suits were rendered in favor of Richard Hail Brown (defendant-appellee) and adverse to Joseph Bateh, Jr., and Fred Bateh (plaintiffs-appellants). While the cumulative relief sought by the two suits was the return of 75,000 shares of capital stock of Southeastern Enameling Company (SECO), which were allegedly being wrongfully withheld by Brown, Joe's suit specifically sought either the return of 37,500 shares of SECO stock together with the value of the hire or use thereof during the period of detention, or in the alternative the sum of $30,000 for money had and received, and Fred only sought the return of 37,500 shares of SECO stock. Plaintiffs' motions for new trials were overruled; hence these appeals.

The facts of these cases are rather complicated and since many of them are in dispute among the various parties, we will first outline the general scope of the transaction involved and then delineate the conflicting contentions among the parties.

Brown and Joseph Bateh, Sr. (father of Joe and Fred), were equal partners in the B–D Development Company (B–D) from December, 1965, to March 22, 1966 (the time of the transaction in question). During that period, Brown had conversed with the original controlling stockholders of SECO regarding the selling of their shares in SECO. The talks culminated on March 22, 1966, and the opportunity arose whereby 119,968 shares of SECO became available for purchase for the sum of $47,500. At that time, B–D owned a substantial amount of SECO's common stock and it now desired to make the purchase and gain controlling interest in SECO.

A $20,000 down payment for the 119,968 shares was required, but B–D lacked the necessary funds. Bateh, Sr., put up $30,000 toward the purchase price, all or substantially all of which came from a "common pool" which the Batch family, including Joe and Fred, jointly maintained.

The disputed testimony is as follows:

### Joe and Fred Bateh:

They contend that the $30,000 was furnished by their father out of the "common pool" so that they (Joe and Fred) would each own 37,500 shares of SECO stock. It was understood that the stock represented by the balance of the purchase price, $17,500 (secured by a pledge agreement), would be purchased and owned by B–D. (It appears that the remaining 44,968 shares which B–D would then own, after giving appellants the 75,000 shares claimed by them, would be sufficient to give it controlling interest in SECO.) The $30,000 paid over by Bateh, Sr., was done in his capacity as their agent for the purpose of acquiring the stock in their names. It was understood and agreed that Brown would take title to all of the 119,968 shares as agent for appellants and B–D, to be later transferred in accordance with their proportionate interests.

After the purchase price had been fully paid, title to the 75,000 shares was to be placed in the correct names (Brown had all the shares placed in his name during the period that the stock was pledged to secure the balance owed to the sellers, and it ap-

pears that on June 5, 1967, the balance owed to the sellers was paid in full); but Brown, Bateh, Sr., and B–D failed to deliver the stock to them and also failed to transfer their stock on the transfer books of SECO.

### Richard Hail Brown:

He contends that nearly all the stock owned by B–D was purchased in his name. (He was apparently the managing partner of the B–D Company and when various acquisitions were made, they were usually purchased in his name.) Bateh, Sr., was "very active in the buying and selling of stock" and Brown regarded Bateh, Sr., as the one with the greatest knowledge of buying and selling of stocks in the partnership. (However, during the testimony of Charles Morton, the bookkeeper for SECO at the time of the transaction in question, it was stated that from 1962 to 1970 only 10% or 15% of Bateh, Sr.,'s time was devoted to the joint interests of Brown and Bateh.)

When he discussed with Bateh, Sr., the acquisition of the 119,968 shares, he was "pretty sure" that he told him that the stock was bought in Brown's name and that nearly all of the stock owned by B–D was bought in his name. The $30,000 given by Joe and Fred to Bateh, Sr., was a loan to Bateh, Sr., for the use of the partnership; therefore, Joe and Fred have no legal claim to the stock. He knew that Bateh, Sr., put the loan in his sons' names, but he did not know until a year later that the transaction was on the books that way; that on the page of the ledger of B–D Company where a ledger card was labeled "notes payable," there were entries "First National Bank of Birmingham" and several other places where money was borrowed. The ledger sheet showed "Joe Bateh, Jr., $30,000." There was written on this same page a note in Ms. Cole's (a secretary-bookkeeper) handwriting asking, "When is interest payable?"

He never instructed either Ms. Cole or Charles Morton to accrue and reflect inter-

est on any of the accounts payable, and he never gave Ms. Cole any instructions whatsoever on bookkeeping. It was the practice of B–D Company that when the partners would loan money to B–D, it would be entered in the books as an account payable. It was customary at B–D that Bateh, Sr., could write himself a check on the money owed him by B–D or to draw a check any time when there was a loan on the books outstanding to either him or a member of his family. Later, when there was sufficient funds in the B–D account, the checks would be cashed. It was not the custom of B–D to pay interest on loans to B–D by the partners or members of the Bateh family. (It appears that, in the transaction in question, Bateh, Sr., did not draw any checks payable to Joe or Fred for the $30,000 advanced to him.)

The first time he heard from the Bateh family that they were claiming stock in their own name, rather than as part of the partnership, was in June or July of 1969. He did admit, however, that in 1967 there was some conversation between Bateh, Sr., and himself regarding letting the "boys" (Joe and Fred) have some preferred stock in SECO. It was August of 1967 when the conversation arose about Joe and Fred wanting SECO stock in their own names. Bateh, Sr., had stated that some stock ought to be given to his boys for the loan.

Several months later, the stock question arose again. At this time, he volunteered to give Bateh, Sr., some preferred stock (a $20,000 share certificate) for his sons. When this conversation took place concerning giving the boys stock, preferred stock was discussed. Bateh, Sr.'s only complaint about the stock was that it was not callable, but the voting rights were never mentioned by Bateh, Sr., at this time.

### Charles Morton (Bookkeeper):

There were no check swaps or checks given for the $30,000 deposited to B–D's account. It appeared from the ledger that the $20,000 which went for the down pay-

ment on that stock came out of money deposited on or about that time from sources in the Bateh family.

Brown said to him "we should accrue interest on this account"—referring to the $30,000 entry—though Morton never accrued interest on the account. Also, he talked to Bateh, Sr., in the presence of Ms. Cole and informed Bateh, Sr., of Brown's wishes; but Bateh, Sr., replied, "No, we are not due interest, don't record any" or "don't pay any." At no time was interest paid on the account. This conversation took place in 1967.

In the late summer or fall of 1967, a conversation took place in Brown's home to which he was a party. Brown was discussing putting some stock in Joe and Fred's names. Brown did not name what kind of stock when mentioning the transfer of stock. It was in subsequent conversations that Brown mentioned "preferred" as the method of payment. Later in 1967, he explained to Bateh, Sr., that the stock was preferred non-voting. (The transaction which is the subject of this suit is set up on the books of the B–D Company as an account payable to Bateh, Jr.)

*Joseph Bateh, Sr.:*

(At the time the $20,000 share certificate was offered to Bateh, Sr., for his boys, the B–D Company was financially insecure.) Morton came up to him and said, "Here is preferred stock worth $3.00 per share." It was about 5 P.M. and the office was closing. He replied to Morton, "I don't want preferred stock"; but "I took it home with me and I read it, and I found out the stock was $1.50 a share and not $3.00. I gave it back to Morton the next morning after I read it at home." He told Ms. Cole his children were buying the $30,000 worth of stock for themselves.

The evidence also discloses the following: Joe and Fred at no time made any request for a note or other evidence of indebtedness for their "loan" to B–D. From time to time the B–D Company had made investments for the Bateh family. Sometime between 1959 and 1969 the Bateh family had bought stock in the Ozark Motel where the procedure was to give B–D money in return for stocks. B–D not only made investments in its own name but that of members of the Bateh family as well.

The partnership was dissolved on May 14, 1970, by court order, and the corporate stock owned by B–D was divided equally between Brown and Bateh, Sr. (For a more detailed history of this case, including other provisions of the trial Court's decrees in two separate actions and their reversals, see Bateh v. Brown, 289 Ala. 695, 271 So.2d 830 (1972); and Bateh v. Brown, 289 Ala. 699, 271 So.2d 833 (1972).)

The issues raised on this appeal are whether the trial Court erred in:

(1) granting Brown's motion for consolidation of Joe and Fred's cases;

(2) refusing their first requested charge which said in effect that since the stock was purchased with their money and was registered in the name of Brown, there was a presumption of a resulting trust arising in their favor;

(3) refusing to give their third requested charge—every partner in a partnership is not only a principal but also an authorized agent who, while acting within the scope of partnership business, can effectively contract for and bind the partnership;

(4) orally instructing the jury that if they find appellants are entitled to a judgment for the stock, then they should decide whom the judgment would be against and the number of shares appellants would be entitled to receive, since this was highly prejudicial due to the element of confusion it created; and

(5) allowing a jury verdict contrary to the preponderance of the evidence to stand.

## I.

Appellants assert that the granting of the motion for consolidation was error due to Joe's alternative claim for either the stock, or its monetary equivalent, and Fred's claim for only the stock since it confused the jury as to the actual nature of the relief sought.

ARCP, 42(a), states:

"When actions *involving a common question of law or fact* are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." [Emphasis supplied.]

Appellants acknowledge the fact that a trial court has broad discretion as to whether it will allow consolidation, but they argue that consolidation should not be allowed where it may result in prejudice to one or more of the parties. Ex parte Miller, 273 Ala. 453, 142 So.2d 910 (1962); Ex parte Montgomery, 247 Ala. 497, 25 So.2d 171 (1946). While we are in complete agreement with the foregoing contention, we do not feel that consolidation, here, resulted in prejudice to either of the appellants. Plaintiffs were two brothers, suing the same partnership and partner jointly and severally on claims arising out of the same transaction. Nor do we agree with the contention that Joe's prayer for alternative relief—the monetary equivalent of the stock—can be deemed such an inconsistent form of relief as to render inapplicable the consolidation procedure provided by Rule 42(a). The recovery of either (the stock or its monetary equivalent) would place each of them in substantially the same position as he was at the time just prior to the original transaction in question.

We hold that consolidation of these two actions was not such an abuse of discretion on the part of the trial Judge as to require reversal. This is further demonstrated by the clarity of the trial Court's instructions to the jury delineating the distinction between the two claims.

## II.

The refused charge pertaining to the elements of a resulting trust is as follows:

"The Court charges the jury that where one person's money is used in payment for personal property, and the title to the property is taken in the name of another, there is a presumption of resulting trust arising in favor of the party whose money was used to the extent of the sum so used."

In support of their argument that the refusal of the foregoing charge was error, appellants quote from Merchants Nat. Bank of Mobile v. Bertolla, 245 Ala. 662, 18 So.2d 378 (1944):

"As pointed out in the recent case of Marshall v. Marshall, 243 Ala. 169, 8 So.2d 843, the rule of resulting trusts depends upon equitable presumption of intention, and it is the settled general rule that presumably when land or other property is purchased by one with the money of another, a trust results to him who advances the purchase money thereof, the title being taken in the name of the person making the purchase or in the name of a third person. That is the simple theory upon which this case rests."

For purposes of review, we will assume without deciding the correctness of the legal proposition set forth in the above requested instruction. Conspicuously missing therefrom, however, is the requisite factual determination by the jury of the crucial issue in the litigation, i. e., whether the purchase money for the stock was a loan to the partnership as contended by Brown, or, as contended by Joe and Fred, money paid over by Bateh, Sr., as their agent, for the

purchase of stock in their individual names.

■ The application of the legal principle contained in this requested instruction is necessarily dependent upon a reasonable satisfaction by the jury from the evidence of the factual contentions of Joe and Fred with respect to the use of the money. Absent this hypothesis, the requested instruction is rendered a mere statement of an abstract legal principle; and, in accordance with well-established rules of appellate review, we will not reverse the trial court for its refusal of a written requested charge which reflects a general statement of law not hypothesized on the evidence, or which does not instruct the jury of its relation to the issues being litigated. Bagley v. Grime, 283 Ala. 688, 220 So.2d 876 (1969). (As to the nature and measure of proof required to establish a resulting trust, see Banks v. Banks, 253 Ala. 252, 44 So.2d 10 (1950).)

In so holding, we pretermit any consideration of two secondary issues: 1) whether the requested charge, assuming the inclusion of the hypothesis, confuses the distinction between the legal theories of resulting and constructive trusts;[1] 2) the procedure for the trial of legal and equitable claims in the same cause under our merged system. See Donaldson and Wall, "Merger of Law and Equity in Alabama— Some Conclusions," Vol. 33, No. 2, The Alabama Lawyer, p. 134 (1972). See also ARCP, 39.

### III.

As to the agency question, the refused charge stated:

"The Court charges the jury that every partner in a commercial partnership is not only a principal, but is also, for all purposes within the scope and objects of the partnership, a general and authorized agent of the firm, and while acting within the scope of the partnership business can effectively contract for and bind the partnership itself and thus the other partners."

■ The law is clear to the effect that a refusal of a written charge is not error where the court's oral instructions covered the principles sought to be enunciated in the refused charge. Gilmore Industries, Inc. v. Ridge Instrument Co., 288 Ala. 127, 258 So.2d 55 (1972); ARCP, 51.

In its oral instructions, the Court stated:

"Now, there are some principles of law that you would have to understand in order to decide that issue.

"One of those, I think, would be concerned with the right of one partner to obligate another partner in a partnership transaction. Well, the law in that respect is this: That when two people are operating as a partnership, each having equal ownership, and equal authority in the corporation, that when one of those partners makes a transaction with some third party for and on behalf of the partnership, acting as a representative of the partnership, then they are both bound by it. So, one thing that you would have to determine is whether or not Mr. Bateh, Sr., made an agreement with these two plaintiffs, whereby they were to be issued stock in Southeastern Enameling Corporation, for the money that they claim that was put up either by them or for them, or from a joint fund.

"If Mr. Bateh, Sr., did make such an agreement, then you should determine the next question. In making that agreement, *was he acting solely as a representative of his sons or was he acting as a representative of the B and D Company.*

"If he was, then both partners would be responsible for any agreement that he

---

1. For a discussion of the distinction between these types of trusts, see Costell v. First National Bank of Mobile, 274 Ala. 606, 150 So.2d 683 (1963).

may have made. If you find he was not acting as a representative of the partnership, but if you find that further that his other partner, Mr. Brown, was advised of the agreement that he made and ratified it, confirmed it, accepted the benefits from it, then that in law would amount to a ratification. If you find that to be the situation, then both would be responsible." [Emphasis supplied.]

Appellants contend that such was an "all or nothing" charge since it implies that Bateh, Sr., could either be a representative of his sons or of B–D, but not both at the same time. With this we cannot agree since the natural interpretation of such a statement is that he either acted solely for his sons, or for both his sons and B–D. In fact, if Bateh, Sr., was acting solely for his sons, then he necessarily could not have been acting as a representative of the partnership so as to bind it by his acts.

## IV.

■ Appellants also assign as error the Court's giving of the following oral instruction:

"If you find that he is entitled to a judgment for the stock, then you would determine which of the two defendants the judgment would be against, and you would determine their number of shares that he would be entitled to receive."

They claim that such a charge is both misleading and incorrect since it created confusion in the minds of the jurors as to just which of the two partners would be liable. A reading of the following italicized portions of the charge, however, clearly shows that under this hypothesis both Brown and Bateh, Sr., would be liable to appellants:

"If you find that he is entitled to a judgment for the stock, then you would determine which of the two defendants the judgment would be against, and you would determine their number of shares

that he would be entitled to receive, *bearing in mind this principle: Now, that when you are dealing with a partnership, one of the partners makes a contract or an agreement on behalf of the partnership dealing with one who is not a member of that partnership, then both of them would be responsible and liable on that contract and agreement."* [Emphasis supplied.]

## V.

■ Lastly, appellants contend that the verdict of the jury was contrary to the preponderance of the evidence. As to this assignment of error, it should be noted at the outset that four basic rules control our scope of review:

(1) The evidence will be viewed in a light most favorable to the appellees without regard to any view which this Court might have as to the weight of the evidence, and it will allow such reasonable inferences as can be drawn by a jury. Riley v. Banks, 289 Ala. 56, 265 So.2d 599 (1972);

(2) All lawful presumptions are entertained by this Court that the trial court acted correctly, unless the contrary is made to appear from the record. Johnson v. Fishbein, 289 Ala. 328, 267 So.2d 405 (1972);

(3) A jury verdict carries with it a presumption of correctness and, when a trial court refuses to grant a motion for a new trial, such presumption is strengthened. Gleichert v. Stephens, 291 Ala. 347, 280 So.2d 776 (1973); and

(4) A jury's verdict, which is presumed to be correct, will not be set aside unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence is against the verdict, and is so decidedly so as to clearly convince the

Court that it is palpably wrong and manifestly unjust. Kilcrease v. Harris, 288 Ala. 245, 259 So.2d 797 (1972).

Appellants cite various excerpts of the evidence which they claim lead to the unavoidable conclusion that Joe and Fred intended to and did buy the SECO stock. They stress the fact that the deposit slips reflect Joe and Fred's names in B–D's ledger.

The record reveals, however, that Joe also testified, "I assume the deposit slip reflects my check and was drawn from my personal account, but upon reflection I do not know—I could not find any records reflecting that I wrote a check . . . The purpose of books at a business is to tell a picture and record it—in all of the books at SECO there is not one entry that says my brother and I are entitled to the stock."

While it is true, as appellants claim, that they acquired an interest in the joint venture with the motel, in that case, as Brown stated, "This involvement was pursuant to a written joint venture agreement."

Additionally, the following facts were disclosed: Joe and Fred never said anything to Brown about receiving stock from the transaction; Bateh, Sr., could not really remember where the purchase money came from; Bateh, Sr., told Brown that "he was to give the boys something for the loan."; and Peyton Bibb, the lawyer who negotiated the transaction, never heard from either Brown or Bateh, Sr., that Joe and Fred were to receive any of the stock.

Clearly, there is suffficient evidence to support a jury verdict in favor of appellees.

Affirmed.

HEFLIN, C. J., and MERRILL, BLOODWORTH, MADDOX and SHORES, JJ., concur.